**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **IRENE SIFUENTES**, | |
| Plaintiff, | |
| v. | Civil Action No. 7:13-CV-88 (HL) |
| **NATIONAL BEEF PACKING COMPANY, LLC**, | |
| Defendant. | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 28). After reviewing the pleadings, briefs, affidavits, and other evidentiary materials presented, and determining that there is no genuine dispute of the material facts, the Court finds that Defendant is entitled to judgment as a matter of law and grants Defendant's motion.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

**A.      Local Rule 56**

In compliance with Local Rule 56, Defendant filed a separate statement of material facts in which Defendant contends there is no genuine issue to be tried. (Doc. 29). Defendant properly numbered each factual statement and provided the support of a specific citation to the record. See M.D. Ga. L.R. 56.

Both Local Rule 56 and Federal Rule of Civil Procedure 56(e) require Plaintiff as the non-moving party to respond to each of the movant's numbered material facts. "All material facts contained in the moving party's statement which are not specifically controverted by specific citation to the record shall be deemed to have been admitted, unless otherwise appropriate." M.D. Ga. L.R. 56. Plaintiff here filed a three paragraph Statement of Disputed Material Facts that does not explicitly reply to a single one of the seventy-six enumerated paragraphs set forth by Defendant. (Doc. 32-1). Plaintiff's counter-statement does nothing more than provide a generalized denial of some of the conduct in which Defendant alleges Plaintiff engaged with no evidentiary support. Accordingly, as provided by Local Rule 56, the facts outlined by Defendant in its Statement of Undisputed Material Facts are deemed admitted.

Even though the Court deems Defendant's submitted facts admitted, Defendant "continues to shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact, and the court must satisfy itself that the burden has been satisfactorily discharged." Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008). The Court must "review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." Id. at 1269 (quotation and internal quotation marks omitted). The Court has so reviewed the record, and viewed in the light most favorable to Plaintiff, finds the facts for purposes of summary judgment to be as follows.

2

### B.     Plaintiffs' Employment at National Beef

Defendant National Beef Packing Company, LLC ("National Beef") is a beef processor headquartered in Kansas City, Missouri. (DSOMF ¶ 1). The company processes and packages beef and beef products in eight different plants throughout the United States, including Case Ready Packaging in Moultrie, Georgia ("Moultrie Plant"), where Plaintiff worked. (DSOMF ¶ 2). Defendant hired Plaintiff to work as a tray packer at the Moultrie Plant on June 27, 2012. (DSOMF ¶ 15). Plaintiff remained in the tray packing position until October 3, 2012, when Defendant transferred Plaintiff to the box trim department after receiving multiple complaints about Plaintiff's inability to get along with her co-workers. (DSOMF ¶¶ 21, 23; Sifuentes Dep., p. 205; Doc 31-1, p. 21-23). Defendant transferred Plaintiff again on December 17, 2012, to the scanning station. (DSOMF ¶ 24). The purpose of the transfer was to minimize Plaintiff's interactions with other employees. (DSOMF ¶ 25). Plaintiff testified during her deposition that she wanted to be by herself and that she asked to be moved. (Sifuentes Dep., p. 208). Plaintiff remained in this position until her termination on January 22, 2013.

### C.     Defendant's No Harassment Policy and Work Rules

During new employee orientation, Plaintiff, along with all other new hires, attended a training session covering a multitude of topics, including equal employment and anti-harassment policies maintained by Defendant. (DSOMF ¶

13; Sifuentes Dep., p. 56-58). Plaintiff completed the anti-harassment training on June 27, 2012. (DSOMF ¶ 17). At the conclusion of the training, Plaintiff certified that she understood Defendant's "zero tolerance policy" regarding harassment as well as "the importance of professional conduct" in the workplace. (DSOMF ¶ 18). Plaintiff additionally received a copy of Defendant's employee handbook and signed an acknowledgment form, confirming that Defendant issued her the handbook and that she understood the contents thereof. (DSOMF ¶¶ 12, 16, 18).

Defendant's No Harassment Policy as outlined in the employee handbook defines "harassment" as

> Verbal or physical conduct by an Employee or any individual (including a client, customer, vendor or supplier) that degrades or shows hostility or aversion toward an Employee because of his or her race, color, religion, age, national origin, ancestry, sex, gender, disability, handicap, pregnancy status, veteran or other military status, or other status protected by law, and that: (1) has the purpose or effect of creating an intimidating, hostile, abusive or offensive work environment; or (2) has the purpose or effect or unreasonably interfering with an individual's work performance; or (3) otherwise adversely affects any term or condition of an individual's employment.

(DSOMF ¶ 5). The handbook further explains that sexual harassment encompasses acts intended to be "jokes" or "pranks" that "could be construed as hostile or demeaning," including, for example, "[o]ffensive sexual flirtations; [s]exually degrading or vulgar words; [u]nwelcome touching or physical contact; [w]histling in a sexually suggestive manner; [u]nwarranted sexual compliments, innuendos, suggestions or jokes." (Doc. 31-1, p. 9). Violation of Defendant's no

4

harassment policy constitutes a major work rule violation "which will subject Employees to immediate disciplinary action, up to and including termination." (DSOMF ¶ 8-9).

In the event that an employee experiences sexual harassment, the handbook provides instructions on how to report the allegations:

> Any employee who has a complaint of discrimination, including harassment based on race, color, religion, age, national origin, ancestry, sex, gender, disability, handicap, pregnancy status, veteran or other military status, or other legally protected status shall bring the matter to the immediate attention of his or her immediate supervisor, the next higher level of management above the immediate supervisor, the general manager, or by calling the Kansas City office at (800) 449-2333 and speaking with the Employee Relations Manager.

(DSOMF ¶ 6). Defendant also maintains a non-retaliation policy that prohibits retaliation against anyone who reports harassment or who cooperates in the investigation of an allegation of harassment. (DSOMF ¶ 7).

### D.  Plaintiff's Sexual Harassment Complaint

While in the box trim and scanning departments, Plaintiff worked in close proximity to Barry Arnold, who served as a lead, or "red hat," for multiple work stations. (DSOMF ¶ 29). Leads are not supervisors.[1] They have no authority to discharge employees, demote employees, dock an employee's pay, or otherwise

---

[1] In her complaint, Plaintiff identifies Arnold as her supervisor. (Doc. 1 ¶ 5). She also refers to him as a "crew leader." (Doc. 1 ¶ 13). Defendant's statement of facts, which Plaintiff failed to refute, clarifies Arnold's role as a "red hat" for Defendant, which is not a supervisory position. (DSOMF ¶¶ 29-31).

discipline or impact the employment status of any employee. (DSOMF ¶ 31). Rather, the duty of a "red hat" is to monitor various work stations and to offer assistance where needed. (DSOMF ¶ 30).

Sometime around September or October 2012, Plaintiff alleges Arnold began displaying flirtatious behavior toward her. Plaintiff explained, "It started just the talking. . . . At first he started, like, talking to me real sexual, looking at me, giving me the eyes." (Sifuentes Dep., p. 69). Arnold would bite his lips and look at Plaintiff "all the time with that look." (Sifuentes Dep., p. 63, 109). As Plaintiff was checking boxes, Arnold "would look up to me and give me the sexual look. . . . He would turn back around and give . . . me, the face that – the moving the eyebrows up and down." (Sifuentes Dep., p. 117).

The sexual looks developed into commentary. Arnold inquired whether Plaintiff was married. (Sifuentes Dep., p. 69, 126). In September or October 2012, Arnold commented that he liked Plaintiff's mother-in-law, who also worked for Defendant, and asked "how would she think about if I was dating a black guy." (Sifuentes Dep., p. 127). He called out "whoa" one day when Plaintiff was heading into work with a group of other female employees. (Sifuentes Dep., p. 119-121). On another occasion, Arnold told her about a supervisor who was caught having sex in an upstairs room of the plant. (Sifuentes Dep., p. 96-97). While there were other employees present during this exchange, and even though Plaintiff admits to already having heard this bit of gossip, Plaintiff felt as

6

though Arnold was directing the story toward her in the form of a proposition. (Sifuentes Dep., p. 97-98). Sometime in December 2012, Arnold asked for a kiss, telling Plaintiff that he wanted to try her lips. (Sifuentes Dep., p. 101, 106). Plaintiff rebuked Arnold's advance and reminded him that she was married. (Sifuentes Dep., p. 106). Plaintiff claims Arnold later told her "that he never tried a Hispanic girl, and that he would like to try me in bed." (Sifuentes Dep., p. 95).

At some point in December 2012, Arnold's advances became physical. On four different occasions Arnold allegedly touched or grabbed Plaintiff's bottom. (Sifuentes Dep., p. 63, 65, 66-67, 69). One day while Plaintiff was filling in at the taper position, she was struggling with a box. (Sifuentes Dep., p. 88-89). Arnold came "behind me, and he had his front part on my bottom, close up. I mean, I was holding on to the box, because I didn't know what to think. I just know that it was improper." (Sifuentes Dep., p. 89). On another occasion Arnold again pressed himself up against Plaintiff, only this time his penis was erect. (Sifuentes Dep., p. 95). He leaned in and "made a comment that there was a pallet room – . . . – that nobody would be in there, and if I wanted to go in there with him." (Sifuentes Dep., p. 93-94). Plaintiff laughed at Arnold's comment and did not take him seriously. (Sifuentes Dep., p. 94). When she was having difficulty managing the scanner another day, Arnold stood behind her with her arms around her waist and his hands over her hands to show her how to work the devise. (Sifuentes Dep., p. 115-116).

7

On or about January 13, 2013, Plaintiff aggressively told Arnold to leave her alone. (Sifuentes Dep., p. 155). She complained to him that "when he's not touching me he's not willing to be helpful." (Sifuentes Dep, p. 154). Arnold then "started letting boxes go down, boxes fall, product just – and I was irritated by it." (Sifuentes Dep., p. 154). Plaintiff went to Charles Bonner, her shift supervisor, to report that when Arnold is "not grabbing me, he's not willing to participate in anything. He walks away." (Sifuentes Dep., p. 139-40, 152). Plaintiff "didn't actually go into details" about the alleged harassment with Bonner. (Sifuentes Dep., p. 152). Bonner "took it like a joke. He didn't even write nothing down. He didn't have me sign anything. He said we needed to get along, and that's just all he said. He just walked away." (Sifuentes Dep., p. 141, 145, 148, 151). According to Plaintiff, she and Arnold "wasn't getting along then. We were just arguing about everything." (Sifuentes Dep., p. 141).

Between January 13th and January 17th, Arnold had no contact with Plaintiff. (DSOMF ¶ 35; Sifuentes Dep., p. 154). Arnold would "kind of just disappear . . . – he kind of put me on my own, just, you know, do everything." (Sifuentes Dep., p. 161). On January 15, 2013, Plaintiff reported to the B-Shift supervisor Mike Sands that Arnold was not doing his job. (DSOMF ¶¶ 38-39). Sands conducted a meeting with Plaintiff, Arnold, and Bonner. (Sifuentes Dep., p. 163). Plaintiff said something during the meeting about Arnold touching her but did not characterize the behavior as sexual harassment. (Sifuentes Dep., p. 164).

8

At the end of the conversation, both Plaintiff and Arnold were told to return to work. (Sifuentes Dep., p. 166-67).

Plaintiff went back to her position, but Arnold continued to walk away, leaving products to fall on the floor. (Sifuentes Dep., p. 167). Then, on January 17th, after seeing Plaintiff run off the production floor crying at the start of a break, Sands called Plaintiff back into his office. (Sifuentes Dep., p. 167). At that point, Plaintiff went into detail about the full extent of Arnold's conduct. (DSOMF ¶ 41). She provided a written statement at that time. (DSOMF ¶ 43).

### E.   Investigation of Plaintiff's Claims and Termination

Plant Manager Kareem Kelly and Plant Operations Manager Mark Petrosky initiated an investigation into Plaintiff's allegations of sexual harassment on January 17, 2013. (DSOMF ¶ 42). As part of the investigation, Kelly and Petrosky interviewed both Plaintiff and Arnold and had them provide written statements. (DSOMF ¶¶ 43-44). Arnold admitted to giving Plaintiff his telephone number but denied touching or speaking to Plaintiff in a harassing or inappropriate manner. (DSOMF ¶ 46). Arnold accused Plaintiff of flirting with him and engaging in various behaviors to garner his attention, such as "pulling up her frock over her hips to expose her butt and walk back and forth" or "put[ing] her leg up on a metal piece of the belt to like cock her legs open." (DSOMF ¶ 45).

Defendant suspended Plaintiff and Arnold effective January 17th while the investigation remained ongoing. (DSOMF ¶ 47; Sifuentes Dep., p. 171). Kelly,

9

Petrosky, and Human Resources Manager Mose Kinsey met again on January 18th to continue the investigation. (DSOMF ¶ 48). They interviewed approximately ten of Plaintiff's and Arnold's co-workers and asked each to draft a written statement. (DSOMF ¶ 49). The majority of these statements highlight a common theme: Plaintiff engaged in sex-based conduct with Arnold as well as with another male co-worker, Jeremy Ball. (DSOMF ¶ 50, 55-57). Several employees witnessed, and Ball confirmed, that Plaintiff grabbed Ball's bottom, would "try grabbing [his] private area," and attempted to pull down Ball's sweatpants. (DSOMF ¶ 51). Ball admitted that he likewise touched Plaintiff's bottom. (DSOMF ¶ 52). He too was suspended. (DSOMF ¶ 53). When questioned about her conduct toward Ball, Plaintiff admitted to physical contact: "There was one time where they said, well, did you smack his butt? I said, yeah, one time. I mean, he smacked my butt. Nobody even seen. . . . We were just acting up." (DSOMF ¶ 62; PSODMF ¶ 1; Sifufentes Dep., p. 174).

At the conclusion of the investigation on January 21st, Defendant determined that Plaintiff, Arnold, and Ball all engaged in inappropriate sex-based conduct that violated Defendant's sexual harassment policy. (DSOMF ¶¶ 63, 67). On January 22, 2013, a day after the investigation ended, Defendant received an additional statement from Daniel Carranza, who accused Plaintiff of "bothering" him, repeatedly touching him, and starting a rumor that he "slept with [Plaintiff]." (DSOMF ¶ 60). This complaint, coupled with the information collected during the

course of the investigation into Plaintiff's allegations of sexual harassment, ultimately led to her termination on January 22, 2013. (DSOMF ¶ 68-70). Defendant also terminated Arnold and Ball for their conduct. (DSOMF ¶ 71).

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at

249–50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Trial Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

## III.   ANALYSIS

### A.   Hostile Work Environment

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment "is a form of sex discrimination prohibited by Title VII." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000). Generally, sexual harassment claims arise under two circumstances, either "through a tangible employment action, such as a pay decrease, demotion or termination" ("*quid pro quo*" harassment), or

12

"through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work" ("hostile work environment" harassment). Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1245 (11th Cir. 2004); see also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 760-63 (1998).

Harassment by a co-worker rather than by a supervisor, as Plaintiff alleges here, falls into the "hostile work environment" category since co-workers cannot take employment actions against one another. Id. at 762 ("One co-worker . . . cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall with the special province of the supervisor.") To support a cause of action for a hostile work environment claim created by sexual harassment, an employee must present evidence of the following elements:

> (1) that he or she belongs to a protected group;
>
> (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;
>
> (3) that the harassment must have been based on the sex of the employee;
>
> (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and
>
> (5) a basis for holding the employer liable.

Mendoza v. Borden Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

The parties do not dispute that as a female Plaintiff is a member of a protected group. Defendants likewise do not argue that Plaintiff failed to present evidence that satisfies the second two criteria. Defendants assert only that Plaintiff failed to present substantial evidence to support findings in her favor on the fourth and fifth elements. The Court, thus, will limit its consideration to those two elements.

### B.    Whether Harassment Was Sufficiently Severe or Pervasive

Title VII was not enacted as a "general civility code." Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998). Nor does the statute "reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." Id. Neither mere flirtation nor an offensive utterance or boorish, juvenile, or mean spirited behavior qualifies as sexual harassment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Gupta, 212 F.3d at 584; Breda v. Wolf Camera, Inc., 148 F. Supp 2d 1371, 1375-76, 1381 (S.D. Ga. 2001). Rather, sexual harassment "is severe or pervasive for Title VII purposes only if it is both subjectively and objectively severe and pervasive. Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501, 509 (11th Cir. 2000).

The complaining employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. Harris, 510 U.S. at

21-22. "[W]hether an environment is hostile or abusive can be determined only by looking at all of the circumstances." Id. at 23.   If the victim "does not subjectively perceive the environment to be abusive, the conduct has not altered the conditions for the victim's employment, and there is no Title VII violation." Id. at 21-22.

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abuse – is beyond Title VII's purview." Id. at 21. The Supreme Court and the Eleventh Circuit identified the following factors to establish objectivity: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza, 195 F.3d at 1246.

Plaintiff subjectively believed that she was the victim of sexual harassment, hence the filing of this lawsuit. However, Plaintiff has failed to present evidence that her perception of the events alleged is objectively reasonable. First, the conduct alleged by Plaintiff was not frequent. Over a four month period, Plaintiff alleged that Arnold made approximately eight sex-based comments to her. Some of this commentary was innocuous, such as asking Plaintiff whether she was married. Other conversations involved plant gossip about a supervisor caught by his wife in a compromising position with another woman, a story about which

Plaintiff had already heard from another co-worker. The other commentary described by Plaintiff, along with Arnold's flirtatious looks, while crude and inappropriate work behavior, is more appropriately categorized as mere offensive utterances and is not sufficiently severe for Title VII purposes.

In terms of the allegations of unwanted physical contact, Plaintiff alleges that Arnold touched or grabbed her on seven different occasions during the same four month period. She claims that when Arnold would walk past her, he would grab at her bottom. These bottom grabbing shenanigans appear to have been commonplace amongst the trio of Plaintiff, Arnold, and Ball. Plaintiff and Ball admit to grabbing each other in a kind of a workplace game. Plaintiff's willingness to engage in this conduct with Ball belies her allegation that she felt threatened or intimidated when she engaged in similar conduct with Arnold and undermines Plaintiff's claim that this unwanted touching qualifies as severe and pervasive.

On another occasion, Plaintiff claims that Arnold put his arms around her waist and his hand on her hand. At the time this incident occurred, Plaintiff was struggling to operate the scanner. Plaintiff explained that "there was a certain way you had to have the [scan] gun towards . . . the bar codes" in order for the scanner to work. (Sifuentes Dep., p. 113). As the lead in the scanning department, one of Arnold's responsibilities was to assist co-workers. (Doc. 31-1, p. 58). It was Arnold's job to teach Plaintiff to operate the instrument correctly, and some touching was incidental. (Sifuentes Dep., p. 113-115). See Gupta, 212

F.3d at 585 ("We cannot mandate that 'an employer be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they are "coming on" to her.' Nor can we mandate that an employer be required to ensure that supervisors never touch employees on the hand or finger or ask them to lunch.").

The most provocative conduct Plaintiff describes is the two occasions when Arnold allegedly pressed his crotch against Plaintiff's backside. Plaintiff explained that during the first such incident she was holding onto a box. Arnold came up behind her, presumably to assist with the box, and "had his front part on my bottom, close up." (Sifuentes Dep., p. 89). She stated that she did not know what to think. The second time Arnold pressed himself against her, Plaintiff testified, "I would say maybe he was horny, maybe? I don't know how to put it." (Sifuentes Dep., p. 91). While in such close proximity, Arnold commented that there was an empty pallet room they could go to together. (Sifuentes Dep., p. 93-94). Ball, who was working nearby, heard Arnold and laughed. Plaintiff likewise laughed and thought Arnold was joking. (Sifuentes Dep., p. 93-94).

Plaintiff urges the Court to analogize her case to the Eleventh Circuit's findings in Johnson. 234 F.3d 501 (11th Cir. 2000). There, the court found that the allegation of fifteen instances of harassment in a four month period was not infrequent. Id. at 509. The behavior described in that case, including "unwanted massages, standing so close to [the plaintiff] that his body parts touched her from

behind, and pulling his pants tight to reveal the imprint of his private parts," in the court's opinion was sufficiently severe and physically threatening and humiliating to fall within the definition of sexual harassment. Id.

Plaintiff here alleges a similar number of instances of harassment over the course of a comparable period of time as that described in Johnson. Plaintiff also alleges that Arnold, like the defendant in Johnson, on two different occasions pressed his private parts against her from behind. Even considering these similarities, the Court finds that the facts alleged by Plaintiff are distinguishable from Johnson. Viewed in isolation, the narration of the Arnold's physical conduct toward Plaintiff does align itself with the facts in Johnson. However, as the Supreme Court explained in Oncale, the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." 523 U.S. at 82. In this case, there clearly was a culture of banter and frequent physical contact between Plaintiff, Arnold, and Ball. And, while Plaintiff now contends that she felt harassed by Arnold's conduct, at the time the most egregious physical contact between Plaintiff and Arnold occurred, Plaintiff admits that she laughed at Arnold and that she thought he was joking.

Even if Arnold's behavior might have offended Plaintiff, she has presented no evidence that Arnold's unwanted advances intimidated her or interfered with

her ability to complete her work assignments. To the contrary, it was only when Arnold ceased paying any attention to Plaintiff that she lodged a complaint for sexual harassment. Plaintiff has failed to satisfy the fourth factor to support a prima facie case for her hostile work environment claim; therefore, Defendant is entitled to summary judgment. The Court need not evaluate the remaining element to determine whether there is a basis for holding Defendant liable for the acts of harassment alleged.

## C.    Retaliation

Under Title VII, it is unlawful for an employer to discriminate or retaliate against an employee who opposes a prohibited employment practice or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity." Jones v. Flying J, Inc., 409 F. App'x 290, 294 (11th Cir. 2011) (citing Howard v. Walgreen Co., 605 F.3d 1239, 1244 (11th Cir. 2010)); accord Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007). Statutorily protected expression includes filing complaints with the Equal Employment Opportunity Commission ("EEOC") or superiors about alleged sexual harassment. See, e.g., Rollins v. State of Fla. Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir.

1989) ("The protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employer's internal grievance procedures.").   Recovery for a retaliation claim does not require proof of the underlying discrimination claim as "'long as [the plaintiff had a reasonable good faith belief that the discrimination existed.'" Gupta, 212 F.3d 571, 586 (11th Cir. 2000) (quoting Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994).

Plaintiff meets the first two prongs of the prima facie requirement. First, she engaged in an activity protected by Title VII when she reported to her supervisor that Arnold was sexually harassing her. Second, after receiving Plaintiff's complaint, Defendant immediately placed her on leave. At the conclusion of the ensuing investigation, Defendant terminated Plaintiff's employment, the ultimate adverse employment action.

The final element Plaintiff must establish is a causal connection between the protected activity and the adverse action. Causation may be established by showing close temporal proximity between the statutorily protected activity and the adverse employment action. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). Plaintiff first approached her shift supervisor about her conflict with Arnold on or about January 15, 2013. She filed her formal complaint with Defendant on January 17th. Defendant suspended Plaintiff that same day

pending the conclusion of the investigation. On January 22nd, Defendant met with Plaintiff to inform her of its findings and to notify her of her termination. The five day gap between when Plaintiff officially complained to Defendant that she was being sexually harassed and when Defendant terminated her employment satisfies the temporal proximity requirement. See generally Clark County Sch. Dist. V. Breeden, 532 U.S. 268, 273 (2001) (citations omitted) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that temporal proximity must be 'very close.'") A reasonable fact finder thus could find a causal connection between Plaintiff's protected activity and her termination. See Bechtal Constr. Co. v. Sec. of Labor, 50 F.3d 926, 934 (11th Cir. 1995) ("Proximity in time is sufficient to raise an inference of causation.") Therefore, Plaintiff has established a prima facie case of retaliation.[2]

---

[2] Defendant argues that Plaintiff's own misconduct broke the causal inference of retaliation. Employee misconduct can break the causal inference that may otherwise have arisen. See Hankins v. AirTran Airways, Inc., 237 Fed. App'x 513, 2007 U.S. Dist. LEXIS 13908, * 18-19 (11th Cir. June 14, 2007) (finding no causal connection where plaintiff engaged in misconduct just five days after she complained and "broke the causal chain"). Even though Defendant ultimately terminated Plaintiff after discovering that Plaintiff engaged in conduct that violated Defendant's anti-harassment policy, that conduct occurred prior to Plaintiff engaging in protected activity. Between the time Plaintiff filed her sexual harassment complaint and the conclusion of Defendant's investigation into Plaintiff's allegations, there is no evidence that Plaintiff committed some other terminable offense such that it can be said that she broke the causal connection.

Once the plaintiff makes out a prima facie case, "'the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.'" Sullivan v. National Railroad Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999) (quoting Raney v. Vinson Guard Service, 120 F.3d 1192, 1196 (11th Cir. 1997)). The presumption of retaliation disappears if the defendant offers a legitimate reason. Id. The plaintiff then bears "the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). In other words, the plaintiff must show that "a discriminatory reason more likely motivated the employer" to terminate her." Tex. Dep't of Cmty. Affairs v. v. Burdine, 450 U.S. 248, 256 (1981). However, "the court does not sit as a super-personnel department, and must accept the employer's stated reasons as given. . . . provided that the proffered reason is one that might motivate a reasonable employer." Gaston v. Home Depot USA, Inc., 129 F.Supp. 2d 1355, 1373 (S.D. Fla. 2001) (quoting Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000).

Defendant contends Plaintiff was fired for violating the company's anti-harassment policy and work rules. In the course of investigating Plaintiff's claims of sexual harassment, Defendant learned from multiple other employees that Plaintiff also engaged in inappropriate conduct, particularly toward Ball. Plaintiff

admitted engaging in misconduct with Ball, and she understood that her physical interactions with Ball were the ultimate reason for her termination. Defendant further shows that both Ball and Arnold were terminated for their actions, which violated Defendant's policy against "offensive sexual flirtations" and "unwanted touching or physical contact." (Doc. 31-1, p. 9).

Plaintiff has presented no evidence that Defendant's explanation is a pretext for retaliatory conduct. Plaintiff shows only that she engaged in a protected activity when she reported that she was being sexually harassed and that Defendant promptly terminated her. Her argument that no employees filed complaints against her prior to Defendant initiating the investigation into this case and that "[a]ny allegations of misconduct on behalf of the Plaintiff clearly were brought only as an attempt to preclude Plaintiff from making a prima facie showing of retaliation" is meritless. (Doc. 32-2, p. 4). There is no evidence that Defendant manufactured evidence. Further, there is no requirement that an employer who learns of a work rule violation must "'refrain from taking investigative and disciplinary action merely because the employee also recently engaged in protected conduct.'" Henderson v. FedEx Express, 2010 U.S. Dist. LEXIS 29528, *27 (M.D. Ga. March 26, 2010) (citing Taylor v. CSX Transp., 418 F. Supp 2d 1284, 1312 (M.D. Ala. 2006)). Additionally, Plaintiff admitted that Ball "smacked my butt" and that she smacked him back. (Sifuentes Dep., p. 174-77). She further admitted that Defendant told her that her conduct constituted

harassment and violated Defendant's "horseplay" policy. (Sifuentes Dep., p. 177-78). She received instruction early on in her employment about what constitutes sexual harassment and what the consequence is for engaging in certain types of conduct, such as hitting a co-worker, playful though it may appear to be. Thus, the evidence supports the conclusion that Defendant terminated Plaintiff based on her own misconduct and not for a retaliatory purpose. Plaintiff's retaliation claim must be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment. (Doc. 28). The Clerk of Court is directed to enter judgment in favor of Defendant and to close this case.

**SO ORDERED**, this 18th day of August, 2014.


*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks